**Page 2**

1  * * * * *
2          ARLENE DUNN,
3  called as a witness, having been first duly sworn to
4  tell the truth, the whole truth, and nothing but the
5  truth, was examined and testified as follows:
6  EXAMINATION BY MR. BISER:
7     Q   Ms. Dunn, my name is Douglas Biser.  I
8  represent NuCar in this case, and I'm going to take
9  your deposition, asking you some questions.  If at any
10 time you need a break, let me know.  If you don't
11 understand the question, I would be glad to repeat it
12 for you.
13        Could you please state your full name and
14 address?
15    A   Barbara Arlene Dunn, 24 Sandy Run, Elkton,
16 Maryland, 21921.
17    Q   How long have you lived at that address?
18    A   Fourteen years.
19    Q   Who do you live there with?
20    A   Myself, no one.
21    Q   By whom are you presently employed?

**Page 3**

1     A   Custom Sportswear, Inc., Blackwood, New
2  Jersey.
3     Q   How long have you worked there?
4     A   Not quite a year.
5     Q   What is your position with them?
6     A   Sales representative.
7     Q   Do you work out of your home?
8     A   Sometimes.
9     Q   Do you have an office in Blackwood, New
10 Jersey?
11    A   Yes.
12    Q   And do you commute from your home --
13    A   Yes.
14    Q   -- to the business in Blackwood?
15    A   Yes.
16    Q   As a sales rep presently, what are your
17 duties or responsibilities?
18    A   Present a sportswear program for elementary
19 schools consisting of imprinted sportswear,
20 sweatshirts, T-shirts, sweat pants.
21    Q   Where did you work before you went to work

**Page 4**

1  for Custom?
2     A   NuCar, Inc.  NuCar Connection, Inc.
3     Q   When did you leave NuCar Connection, Inc.?
4     A   January of 2001.
5     Q   What was your position at NuCar Connection?
6     A   Site controller.
7     Q   Why did you leave?
8     A   The position was dissolved.
9     Q   What were your duties or responsibilities
10 as the site controller?
11    A   I worked with the general manager, James
12 Capron (phonetic), and was responsible for duties he
13 assigned.
14    Q   What were those duties that he assigned to
15 you on an ongoing basis?
16    A   To review expenses, troubleshoot any weak
17 areas.
18    Q   How long were you the site controller?
19    A   Approximately two years.
20    Q   When approximately did you start your
21 position as a site controller?

**Page 5**

1     A   I don't remember exactly.  I think it was
2  March of -- February or March of '98.  I'm not sure on
3  that.
4     Q   And from approximately February or March of
5  '98 until you left in January 2001, did you work at one
6  location?
7     A   Yes.
8     Q   What location was that?
9     A   174 North Dupont Highway, New Castle,
10 Delaware.
11    Q   And that was the dealership?
12    A   Yes.
13    Q   Now, your duties you explained as reviewing
14 expenses and troubleshooting.  Let's just take a look
15 for a minute at the reviewing expenses.  Tell me what
16 it is you would actually do, physically, to review
17 expenses.
18    A   For instance, if receivables are high in a
19 certain area, to bring that to the attention of Mr.
20 Capron.  That's an instance.
21    Q   Okay.  Would that be all of the expenses


PLAINTIFF'S EXHIBIT

Page 18

1   A   A window sticker on the glove box.
2   Q   That's the Moroney sticker?
3   A   That's correct.
4   Q   And that's the sticker that's placed,
5  generally you see them when they're on the lots, on the
6  windows themselves?
7   A   Right.
8   Q   You did not have that on the window, that
9  was in the glove box?
10  A   Yes.
11  Q   Is that generally how, when you drove a
12 demonstrator, where the Moroney sticker would be?
13  A   It would stay on the car if it was not
14 visible.  It didn't harm my visibility.
15  Q   Right.  Okay.  So the one in question was
16 in the glove box itself; is that correct?
17  A   Yes.
18  Q   With regard to this vehicle, do you know
19 whether this particular vehicle, the Chevrolet Camaro
20 that was in this accident, was ever shown to any
21 customer during the period of time that you were using

Page 19

1  it?
2   A   I don't have that knowledge.
3   Q   You have no recollection of that?
4   A   I have no recollection of that.
5   Q   All right.  While you were driving this
6  vehicle, did you ever have occasion to -- was it part
7  of your responsibilities to show this vehicle to any
8  prospective customers?
9   A   It was available to see.  It was in a
10 designated parking spot.  If I went somewhere on an
11 occasion, it was clean.  It was available for anybody
12 to look at.
13  Q   I understand that it was available to look
14 at, but were you ever requested to show it to anyone?
15  A   No.
16  Q   Did you ever have occasion at any time
17 while you were employed by NuCar and driving a
18 demonstrator vehicle, did you ever have occasion to
19 show a vehicle for sales purposes to any person or any
20 prospective customer?
21  A   I went to a golf tournament once and the

Page 20

1  car was available to see, but it was not there just to
2  see.
3   Q   Okay.  All right.  Did you ever have
4  occasion at any time during your employment with NuCar
5  to have a person come up to you and say, I'd like to
6  buy that vehicle, or express interest in purchasing the
7  vehicle that you were driving?
8   A   Yes.
9   Q   When did that occur?
10  A   Often.
11  Q   How often would that have occurred?
12  A   Four or five times a year.
13  Q   When that occurred, did you have any
14 authority to speak for the dealership with respect to
15 selling the vehicle or engaging, entering into a
16 contract of sale?
17  A   No.
18  Q   When inquiries were made such as that, what
19 were you to do, or what did you do?
20  A   On some occasions I had salesmen's business
21 cards.  I would talk about the car, saying that it was

Page 21

1  available for sale and they could contact the sales
2  rep.
3   Q   So what you would have to do, then, is
4  refer that person to the sales organization or office
5  or person?
6   A   That's correct.
7   Q   And so any sales would be done through the
8  sales force; is that a fair statement?
9   A   Yes.
10  Q   Do you know whether that ever occurred with
11 regard to this Chevrolet Camaro?  Had anyone ever
12 approached you at any time expressing interest in
13 purchasing that vehicle or a like vehicle that you can
14 remember?
15  A   I have no recollection.
16  Q   Just to confirm, the use of the vehicle was
17 part of your compensation, and as such there was income
18 attributed to you for the use of the vehicle; is that
19 correct?
20  A   That's correct.
21  Q   On which you paid income taxes?

### Page 46

1 two years, or a year and a half.
2  Q  Do you know whether she's had any medical
3 bills --
4  A  I don't know.
5  Q  -- that weren't -- just let me finish the
6 question -- that she has incurred as a result of this
7 collision, that were not paid through health insurance
8 or some other fashion?
9      MR. BEKMAN: Objection.
10  A  I don't know.
11      MR. BISER: That's all the questions I have
12 now. Thanks.
13      MR. BEKMAN: Ms. Dunn, I'm Paul Bekman. I
14 represent Ms. Whalen.
15 EXAMINATION BY MR. BEKMAN:
16  Q  Good afternoon.
17  A  Hello.
18  Q  The place where this incident took place
19 was in Cecil County?
20  A  Yes.
21  Q  Near Elkton?

### Page 47

1  A  Yes.
2  Q  Close by?
3  A  About twenty minutes from my house.
4  Q  Was it within fifty miles of where the
5 dealership was?
6  A  I would say within fifty miles of my house.
7 I don't know.
8  Q  The dealership is in what part of Delaware?
9  A  New Castle County.
10  Q  And is it your estimate, in terms of time,
11 is it within fifty minutes of where the dealership is?
12  A  No, it's longer.
13  Q  Do you know how much longer?
14  A  No.
15  Q  But it's your understanding that even if it
16 were not within 50 miles, NuCar knew and gave you
17 permission to operate this vehicle outside of 50 miles
18 from the dealership?
19  A  Yes.
20  Q  You were present during the deposition of
21 Mrs. Chickersky, Gail?

### Page 48

1  A  Yes.
2  Q  And you were here and you heard her
3 testimony?
4  A  Yes.
5  Q  Is your understanding as to the use of the
6 demos that she described, particularly the promotional
7 use of the demos, your understanding?
8      MR. BISER: Objection.
9  A  Yes.
10  Q  And that these vehicles were available to
11 be sold at any time?
12  A  Yes.
13  Q  And I think you mentioned that there were
14 times where you might be approached by people who would
15 say to you and ask you about the very car that you were
16 driving?
17  A  Yes.
18  Q  And I take it that you would refer them to
19 NuCar?
20  A  That's correct.
21  Q  And you would promote that, would you not?

### Page 49

1  A  Yes.
2  Q  And was that your understanding as to one
3 of the reasons why you were given a demo car to have?
4  A  It was a general understanding.
5  Q  You also said that you carried with you
6 some salesmen's business cards. Tell me about that.
7  A  For just this occasion.
8  Q  And if somebody were to ask you about a
9 particular car, you would give them a card and say why
10 don't you call Bill, or Tom, or whoever?
11  A  That's correct.
12  Q  And this could happen at any time of the
13 day, any day of the week?
14  A  That is correct.
15  Q  And it did?
16  A  Yes.
17  Q  The license plates that were on the vehicle
18 at the time of the incident, was there both a front
19 license plate and a rear license plate?
20  A  I don't know.
21  Q  Was there a front frame and a back frame?