1

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF MARYLAND

NANCY J. WHALEN,              *
  Plaintiff
                              *
vs.
                              *   CA No. MJG-02-CV-191
NUCAR CONNECTION, INC.,
et al.,                       *
  Defendants
              *    *    *    *    *

The deposition of ARLENE DUNN was held on

Thursday, October 3, 2002, commencing at 11:55 a.m., at

the offices of Mudd, Harrison & Burch, 105 West

Chesapeake Avenue, Towson, Maryland 21204, before Susan

E. Smith, a Notary Public.

              *    *    *    *    *

APPEARANCES:   PAUL D. BEKMAN, Esquire
                 On behalf of Plaintiff

               DOUGLAS W. BISER, Esquire
                 On behalf of Defendant
                 NuCar Connection, Inc.

               C. RUSSELL FIELDS, Esquire
                 On behalf of Defendant Donald Temper

               DAVID F. RYDER, Esquire
                 On behalf of Defendant Arlene Dunn

ALSO PRESENT:  GAIL M. CHICKERSKY


Reported By:  Susan E. Smith, RPR

Page 2

1  * * * * *
2  ARLENE DUNN,
3 called as a witness, having been first duly sworn to
4 tell the truth, the whole truth, and nothing but the
5 truth, was examined and testified as follows:
6 EXAMINATION BY MR. BISER:
7  Q  Ms. Dunn, my name is Douglas Biser. I
8 represent NuCar in this case, and I'm going to take
9 your deposition, asking you some questions. If at any
10 time you need a break, let me know. If you don't
11 understand the question, I would be glad to repeat it
12 for you.
13       Could you please state your full name and
14 address?
15  A  Barbara Arlene Dunn, 24 Sandy Run, Elkton,
16 Maryland, 21921.
17  Q  How long have you lived at that address?
18  A  Fourteen years.
19  Q  Who do you live there with?
20  A  Myself, no one.
21  Q  By whom are you presently employed?

Page 3

1  A  Custom Sportswear, Inc., Blackwood, New
2 Jersey.
3  Q  How long have you worked there?
4  A  Not quite a year.
5  Q  What is your position with them?
6  A  Sales representative.
7  Q  Do you work out of your home?
8  A  Sometimes.
9  Q  Do you have an office in Blackwood, New
10 Jersey?
11  A  Yes.
12  Q  And do you commute from your home --
13  A  Yes.
14  Q  -- to the business in Blackwood?
15  A  Yes.
16  Q  As a sales rep presently, what are your
17 duties or responsibilities?
18  A  Present a sportswear program for elementary
19 schools consisting of imprinted sportswear,
20 sweatshirts, T-shirts, sweat pants.
21  Q  Where did you work before you went to work

Page 4

1 for Custom?
2  A  NuCar, Inc. NuCar Connection, Inc.
3  Q  When did you leave NuCar Connection, Inc.?
4  A  January of 2001.
5  Q  What was your position at NuCar Connection?
6  A  Site controller.
7  Q  Why did you leave?
8  A  The position was dissolved.
9  Q  What were your duties or responsibilities
10 as the site controller?
11  A  I worked with the general manager, James
12 Capron (phonetic), and was responsible for duties he
13 assigned.
14  Q  What were those duties that he assigned to
15 you on an ongoing basis?
16  A  To review expenses, troubleshoot any weak
17 areas.
18  Q  How long were you the site controller?
19  A  Approximately two years.
20  Q  When approximately did you start your
21 position as a site controller?

Page 5

1  A  I don't remember exactly. I think it was
2 March of -- February or March of '98. I'm not sure on
3 that.
4  Q  And from approximately February or March of
5 '98 until you left in January 2001, did you work at one
6 location?
7  A  Yes.
8  Q  What location was that?
9  A  174 North Dupont Highway, New Castle,
10 Delaware.
11  Q  And that was the dealership?
12  A  Yes.
13  Q  Now, your duties you explained as reviewing
14 expenses and troubleshooting. Let's just take a look
15 for a minute at the reviewing expenses. Tell me what
16 it is you would actually do, physically, to review
17 expenses.
18  A  For instance, if receivables are high in a
19 certain area, to bring that to the attention of Mr.
20 Capron. That's an instance.
21  Q  Okay. Would that be all of the expenses

**Page 6**

1 for that dealership that you would review?
2    A    Yes.
3    Q    And then the second area of duties or
4 responsibilities you would say would be troubleshooting
5 the weak areas. Can you tell me what those areas were?
6    A    Warranty is also a receivable, for instance
7 if there were outstanding warranty receivables, or any
8 trends that were set. I also did the same with sale
9 dollars that were leaped for maybe used or new cars
10 sales. We'd just discuss that.
11   Q    Did any part of your job require you to
12 sell vehicles to the public or to customers?
13   A    No.
14   Q    If someone would come to you, a friend,
15 acquaintance, or anyone, and ask you or show interest
16 in purchasing a vehicle from NuCar, what would you do?
17   A    Refer them to a salesperson or a sales
18 manager, someone in that position for that particular
19 vehicle.
20   Q    And would that be the end, then, of your
21 involvement for that kind of inquiry?

**Page 7**

1    A    Yes.
2    Q    By the way, during the years that you were
3 employed at NuCar, did that ever occur?
4    A    Yes.
5    Q    How often would that have occurred?
6    A    If people I knew or friends I saw knew I
7 worked at NuCar and were interested in a particular
8 brand, I would refer them to a salesperson.
9    Q    You had no authority to deal with the
10 public and make representations regarding vehicles that
11 were for sale; is that correct?
12   A    That's correct.
13   Q    You couldn't negotiate a sale --
14   A    No.
15   Q    -- with a prospective customer, correct?
16   A    That's correct.
17   Q    You couldn't give quotes or prices for
18 vehicles, correct?
19   A    That's correct.
20   Q    And you weren't authorized or delegated
21 with the responsibility of explaining to the public or

**Page 8**

1 potential customers features of vehicles and that type
2 of thing?
3    A    That's correct, not my responsibility.
4    Q    Essentially your duties and
5 responsibilities were more bookkeeping and
6 administrative; is that a fair statement?
7    A    That's fair.
8    Q    With no responsibility for sales?
9    A    None.
10   Q    Okay. Now, let me refer back to the time
11 about July of 2000. Were your responsibilities during
12 that period of time as the controller consistent with
13 what you've already testified?
14   A    Yes.
15   Q    Now, at the time of this accident you were
16 driving a demonstrator vehicle?
17   A    Yes, I was.
18   Q    When had you first been given a
19 demonstrator or allowed to use a demonstrator vehicle?
20   A    Through the course of negotiations to be
21 employed at the New Castle site, it was part of the pay

**Page 9**

1 plan.
2    Q    Was that when you first were employed by
3 them --
4    A    Yes.
5    Q    -- or did this come about when you were
6 given the responsibility of site controller?
7    A    No, when I was first employed by them.
8    Q    Let's start off, then, when were you first
9 employed?
10   A    In '86, October.
11   Q    Why don't you take us through just, as best
12 you can remember, your employment history, starting in
13 1986.
14   A    There was a gentleman who was the
15 controller at that time. His name was Tom
16 Paccaeanicia.
17   Q    I'm going to ask you to spell that.
18   A    I have no clue. Paccaeanicia.
19       MR. BISER: Gail, could you help us with
20 that? Do you know the spelling of his name? Does
21 anyone mind if we ask her?

Page 10

1  MS. CHICKERSKY: P-A-C-C-A-E-A-N-I-C-I-A.
2  First name is Thomas.
3  MR. BISER: We're going to have a test on
4  that later.
5  Q  Okay. So your first -- we'll call him Tom.
6  A  All right.
7  Q  You first worked under Tom, correct?
8  A  That's correct.
9  Q  And how long did you work under him?
10  A  Until Gail arrived, and then -- well, no,
11  then it was, after Tom it was Joy, and I can't think of
12  her last name, and then Gail. It wasn't a very long
13  time span between them.
14  Q  When you were employed by Tom, and then
15  Joy, and then Gail, what was your position?
16  A  Office manager.
17  Q  And what were your duties or
18  responsibilities as the office manager?
19  A  Day-to-day operations, clerical,
20  accounting, and to help produce financial statements
21  for the different franchises.

Page 11

1  Q  As the office manager, did you have any
2  responsibilities or role in sales or promotions?
3  A  No, not firsthand.
4  Q  Now, when you were given -- did you work as
5  the office manager then until you were promoted to site
6  controller in February or March of, was that '99? I'm
7  sorry, I can't read my own notes. Did you say February
8  or March?
9  A  I'm not sure of the date --
10  Q  Right.
11  A  -- or the year.
12  Q  But you think you were the site
13  controller --
14  A  '98 maybe.
15  Q  Just to put it in some kind of time frame,
16  you think you were site controller in that position for
17  approximately two years before you left, correct?
18  A  Yes, two or three years.
19  Q  And you were office manager up until you
20  became the site controller?
21  A  Yes.

Page 12

1  Q  Is that correct?
2  A  That's correct.
3  Q  What different responsibilities did you
4  have or different duties did you have when your
5  position went from office manager to site controller,
6  if any?
7  A  I was less involved with the day-to-day and
8  more involved with each departmental. It wasn't just
9  the accounting.
10  Q  Going back again to the time when you were
11  hired, first hired by or started to work for NuCar as
12  the site controller, you said at that time a part of
13  your compensation package included use of a
14  demonstrator vehicle?
15  A  When I was interviewed for the position.
16  Q  Who interviewed you?
17  A  Tom.
18  Q  And what did your compensation package
19  consist of?
20  A  A salary and a demo.
21  Q  When you were hired, then, what were you

Page 13

1  told about the use of the demo?
2  A  At that time, I didn't own a car. Or I had
3  a car. I was given a demo as my car, and they knew I
4  was driving that. That was the only vehicle I was
5  driving.
6  Q  And for the time that you worked for NuCar
7  until you left in 2001, did you continue then to have
8  as part of your compensation package a demo vehicle?
9  A  Yes.
10  Q  Were there any   trictions placed on your
11  use of the demo vehicle.
12  A  No.
13  Q  Now, we've seen earlier today a
14  demonstrator -- it's called a demonstrator plan. It
15  was previously marked as Exhibit 2, dated November 11,
16  1991. Can you take a look at that for me?
17  A  Yes.
18  Q  Is that your signature?
19  A  Yes, it is.
20  Q  Do you know whether there were ever any
21  other documents that you signed that addressed in any

Page 14

1 way the use of the demonstrator vehicle?
2   A   No.
3   Q   Is this the only one?
4   A   This is the only once.
5   Q   Now, you say that there were no
6 restrictions put on the use of your demonstrator
7 vehicle. Do you know whether, after you signed this
8 document on November 11, 1991, as to whether there were
9 ever any additions or modifications to this agreement
10 in any way?
11   A   I often had permission to drive outside of
12 the 50-mile radius since it was the only vehicle that I
13 had --
14   Q   Okay.
15   A   -- to visit my family. When I went on
16 vacation, I would take a demo.
17   Q   After this agreement was signed, did anyone
18 ever deny to you permission that you requested for use
19 of the vehicle outside the 50-mile radius or any other
20 requests?
21   A   No.

Page 15

1   Q   Other than the 50-mile radius restriction,
2 were there any other restrictions that you know were on
3 your use of the demo that you had to request exception
4 to? Indicating no?
5   A   No.
6   Q   I know what you're saying, but she's got to
7 type it down and record it, so you have to answer
8 verbally.
9   A   No.
10   Q   Now, let's talk about the vehicle that was
11 involved in the accident that we're here about today.
12 That was a Chevrolet Camaro?
13   A   Yes.
14   Q   How long had you been driving that vehicle?
15   A   For 4,000 miles. I don't know the time
16 span.
17   Q   It had approximately 4,000 miles on it at
18 the time of the accident; is that correct?
19   A   That's correct.
20   Q   Had you been driving that vehicle since it
21 was delivered to the dealership, do you know?

Page 16

1   A   To the best of my knowledge, yes.
2   Q   Best of your recollection. What dealer
3 designations did the vehicle have on it, if any, at the
4 time of the accident?
5   A   I don't understand.
6   Q   Were there any -- were there any signs,
7 writings, placards, descriptions placed on either the
8 license plate or the vehicle itself that indicated who
9 was the owner of the vehicle?
10   A   There was a NuCar sticker on the back of
11 the car. The license plate had a NuCar frame.
12   Q   Just let me interrupt you one second. The
13 sticker that you're talking about, I know that a lot of
14 dealerships place on the back of vehicles that they
15 sell a little designation of the dealership. Is that
16 the type of sticker that you're talking about?
17   A   Yes.
18   Q   So that's the type of sticker that's placed
19 on all vehicles that NuCar handles, not just
20 demonstrators?
21   A   That's correct.

Page 17

1   Q   So if I was to go in and buy a NuCar car, a
2 new car from Nucar, a Chevrolet Camaro, for instance,
3 and I purchased it and drove away, it would have that
4 NuCar name somewhere on the back; is that correct?
5   A   I would guess. I don't know exactly.
6   Q   All right. So that wasn't something
7 peculiar or particularly done just for demonstrator
8 vehicles, correct, as far as you know?
9   A   As far as I know.
10   Q   All right. Now, the other designation of
11 NuCar you say was on the license plate? Did you say
12 license plate?
13   A   Frame.
14   Q   License plate frame. In other words, the
15 holder of the license plate; is that correct?
16   A   That's correct.
17   Q   Other than that, are there any other signs
18 or indicia of ownership placed on or around that
19 vehicle at the time of this accident?
20   A   There's a dealer tag on the car.
21   Q   Anything else?

### Page 18

1   A   A window sticker on the glove box.
2   Q   That's the Moroney sticker?
3   A   That's correct.
4   Q   And that's the sticker that's placed,
5  generally you see them when they're on the lots, on the
6  windows themselves?
7   A   Right.
8   Q   You did not have that on the window, that
9  was in the glove box?
10  A   Yes.
11  Q   Is that generally how, when you drove a
12 demonstrator, where the Moroney sticker would be?
13  A   It would stay on the car if it was not
14 visible. It didn't harm my visibility.
15  Q   Right. Okay. So the one in question was
16 in the glove box itself; is that correct?
17  A   Yes.
18  Q   With regard to this vehicle, do you know
19 whether this particular vehicle, the Chevrolet Camaro
20 that was in this accident, was ever shown to any
21 customer during the period of time that you were using

### Page 19

1  it?
2   A   I don't have that knowledge.
3   Q   You have no recollection of that?
4   A   I have no recollection of that.
5   Q   All right. While you were driving this
6  vehicle, did you ever have occasion to -- was it part
7  of your responsibilities to show this vehicle to any
8  prospective customers?
9   A   It was available to see. It was in a
10 designated parking spot. If I went somewhere on an
11 occasion, it was clean. It was available for anybody
12 to look at.
13  Q   I understand that it was available to look
14 at, but were you ever requested to show it to anyone?
15  A   No.
16  Q   Did you ever have occasion at any time
17 while you were employed by NuCar and driving a
18 demonstrator vehicle, did you ever have occasion to
19 show a vehicle for sales purposes to any person or any
20 prospective customer?
21  A   I went to a golf tournament once and the

### Page 20

1  car was available to see, but it was not there just to
2  see.
3   Q   Okay. All right. Did you ever have
4  occasion at any time during your employment with NuCar
5  to have a person come up to you and say, I'd like to
6  buy that vehicle, or express interest in purchasing the
7  vehicle that you were driving?
8   A   Yes.
9   Q   When did that occur?
10  A   Often.
11  Q   How often would that have occurred?
12  A   Four or five times a year.
13  Q   When that occurred, did you have any
14 authority to speak for the dealership with respect to
15 selling the vehicle or engaging, entering into a
16 contract of sale?
17  A   No.
18  Q   When inquiries were made such as that, what
19 were you to do, or what did you do?
20  A   On some occasions I had salesmen's business
21 cards. I would talk about the car, saying that it was

### Page 21

1  available for sale and they could contact the sales
2  rep.
3   Q   So what you would have to do, then, is
4  refer that person to the sales organization or office
5  or person?
6   A   That's correct.
7   Q   And so any sales would be done through the
8  sales force; is that a fair statement?
9   A   Yes.
10  Q   Do you know whether that ever occurred with
11 regard to this Chevrolet Camaro? Had anyone ever
12 approached you at any time expressing interest in
13 purchasing that vehicle or a like vehicle that you can
14 remember?
15  A   I have no recollection.
16  Q   Just to confirm, the use of the vehicle was
17 part of your compensation, and as such there was income
18 attributed to you for the use of the vehicle; is that
19 correct?
20  A   That's correct.
21  Q   On which you paid income taxes?

Page 22

1   A   That's correct.
2   Q   Let me refer your attention now to July 4
3 of 2000. That's the date of the accident that we're
4 here about today; is that correct?
5   A   That's correct.
6   Q   At the time of this accident, were you on
7 your own business at that time?
8   A   Yes.
9   Q   Where were you coming from?
10  A   Rock Hall, Maryland.
11  Q   And where were you going?
12  A   To my home in Elkton.
13  Q   And what time of day was it?
14  A   About 11:30 p.m.
15  Q   And Nancy Whalen was a passenger in your
16 vehicle?
17  A   Yes.
18  Q   She was the right front seat passenger?
19  A   Yes.
20  Q   And you were driving?
21  A   Yes.

Page 23

1   Q   No passengers in the rear of the vehicle?
2   A   No.
3   Q   What had you been doing in Rock Hall?
4 Where had you been?
5   A   I had been to visit Nancy's sister and
6 brother-in-law and their children at the Sailing
7 Emporium, which is a marina. And we were to have
8 dinner, watch the fireworks that were sponsored by the
9 marina.
10  Q   And what time did you arrive,
11 approximately, that evening at Nancy's sister's?
12  A   Approximately 7.
13  Q   And what were your activities then from the
14 time you arrived until you all left?
15  A   We ate, listened to the dance band that was
16 there, watched the fireworks, and left.
17  Q   So you stayed at the marina?
18  A   Yes.
19  Q   You didn't visit Nancy's sister at her
20 house?
21  A   No. They had a boat there at the marina.

Page 24

1   Q   They had a boat, okay. Now, this trip was
2 not required or part of your duties with NuCar,
3 correct?
4   A   That's correct.
5   Q   How long have you known Nancy Whalen?
6   A   Three years.
7   Q   And where had you met her?
8   A   Through mutual friends years prior to that.
9 We had met off and on on occasion prior to that.
10  Q   So when you say you've known her for three
11 years, the three years prior to the accident or prior
12 to today?
13  A   Three years prior to today. I met her on
14 occasion prior to that, three years ago, so I had met
15 her earlier.
16  Q   Okay. So you knew her, but not well?
17  A   Right.
18  Q   Is that correct? What is your relationship
19 with Nancy Whalen?
20  A   She's my friend.
21  Q   Are you good friends?

Page 25

1   A   Yes.
2   Q   Are you best of friends?
3   A   Yes.
4   Q   Still?
5   A   I would think so.
6   Q   Tell me how the accident happened.
7   A   The other driver was in my lane, and I
8 steered to avoid getting hit head-on. I steered left
9 to avoid getting hit head-on.
10  Q   Now, as I understand it, the accident
11 happened on Route 213?
12  A   That's correct.
13  Q   Is that correct? And you would have been
14 traveling from White Hall to home, you would have been
15 going northbound?
16  A   From Rock Hall, home, it would be
17 northbound.
18  Q   Did I say White Hall? I'm sorry, Rock
19 Hall. You would have been traveling northbound. And
20 213 is, as I recall in that area -- I'm not very
21 familiar with it but I am somewhat -- is one lane