# WHALEN VS TEMPER

## DEPOSITION OF GAIL M. CHICKERSKY

CONDENSED TRANSCRIPT AND CONCORDANCE
PREPARED BY:

**ART MILLER & ASSOCIATES**
111 SOUTH CALVERT STREET
SUITE 2700
BALTIMORE, MD 21202
Phone: 410-367-3838
FAX: 410-367-3883

**PLAINTIFF'S EXHIBIT** *A*

Page 1

1  IN THE UNITED STATES DISTRICT COURT
2      FOR THE DISTRICT OF MARYLAND
3  NANCY J. WHALEN,          *
4      Plaintiff   *
5  vs.           * Case No.
6  DONALD L. TEMPER, et al,  * MJG-02CU-191
7      Defendants  *
8  - - - - - - - -
9      The deposition of GAIL M. CHICKERSKY was
10 taken on Thursday, the 3rd day of October, 2002,
11 commencing at 10:10 a.m., at the Law Offices of
12 Mudd, Harrison & Burch, 105 West Chesapeake Avenue,
13 Suite 3090, Towson, Maryland, before Dianna C.
14 Kilgalen, RPR, Notary Public.
15 - - - - - - - -
16
17
18
19
20 Reported by:
21 Dianna C. Kilgalen, RPR

Page 2

1  APPEARANCES:
2      PAUL BEKMAN, ESQUIRE
3          On behalf of the Plaintiff.
4      DOUGLAS BISER, ESQUIRE
5          On behalf of the Defendant,
6          NuCar Connection.
7      RUSSELL FIELDS, ESQUIRE
8          On behalf of the Defendant,
9          Donald L. Temper.
10     DAVID F. RYDER, ESQUIRE
11         On behalf of the Defendant,
12         Barbara Dunn.
13 - - - - - - -
14 Present:
15     Barbara Dunn, Party Defendant.
16
17
18
19
20
21

Page 3

1          I N D E X  O F  W I T N E S S E S
2  WITNESS                              PAGE
3  GAIL M. CHICKERSKY
4  By MR. BEKMAN:                       04
5
6          INDEX OF EXHIBITS
7  CHICKERSKY
8  EXHIBITS                             PAGE
9  No. 01   Notice                      05
10 No. 02   Demonstrator Plan           39
11 No. 03                               43
12 No. 04   Accident report             45
13 No. 05   Personnel file              48
14 No. 06   Insurance binder            51
15       EXHIBITS RETAINED BY COUNSEL
16
17
18
19
20
21

Page 4

1              GAIL M. CHICKERSKY
2  the Deponent, called for oral examination by the
3  Plaintiff, being first duly sworn to tell the
4  truth, the whole truth, and nothing but the truth,
5  testified as follows:
6          EXAMINATION BY MR. BEKMAN
7  Q   Would you give us your full name, please?
8  A   Gail Elizabeth McClary Chickersky.
9  Q   Mrs. Chickersky, give us your current
10 address, please.
11 A   29 Georgian Circle, Christine Manor,
12 Newark, Delaware 11711.
13 Q   Ms. Chickersky, have you ever had your
14 deposition taken before?
15 A   Yes, sir, I have.
16 Q   So you know a little bit about what is
17 going to happen today.
18 A   Yes, sir.
19 Q   I'm going to be asking you some questions.
20 Other counsel may have questions for you.  It is
21 important for you to understand the questions that

Page 21

1  for your best recollection. You can talk to her
2  later. So your recollection is that you think she
3  was working for NuCar, Inc. and you were at NuCar
4  Connections, Inc.?
5  A   That is correct.
6  Q   Were you at the same location?
7  A   No, sir.
8  Q   Where was she and where were you?
9  A   She was in Dover, Delaware. My main
10 office was in New Castle, Delaware.
11 Q   So from 1991 when you came back to work,
12 did there come a point in time when Ms. Dunn and
13 you worked in the same office?
14 A   Because I'm in a position of controller
15 and responsible for all of the office managers,
16 there were times immediately that we worked in the
17 same office, because I would travel to Dover.
18 Q   So from 1991 on, was it your understanding
19 that she continued to work for NuCar, Inc.?
20 A   She transferred to NuCar Connection, and I
21 would think that happened between 1992 and 1994.

Page 22

1  Q   So she came to work for NuCar Connection,
2  Inc. somewhere in that vicinity?
3  A   Yes, sir.
4  Q   Would that then have placed her at the New
5  Castle location?
6  A   Yes, sir.
7  Q   Instead of Dover?
8  A   Yes, sir.
9  Q   Is that where she stayed?
10 A   Yes, sir.
11 Q   What about your, if you will, main office,
12 your main location from day to day, or did you have
13 such a thing?
14 A   Yes.
15 Q   Where would that have been?
16 A   From 1991 to 1998, I believe, that was in
17 the New Castle dealership. Then for probably 20
18 to 24 months, I worked out of my home in Newark.
19 And in 1997, I also had an office in the Middletown
20 store, in December of 1997.
21 Q   On an average, how often would you be at

Page 23

1  the New Castle location?
2  A   Until I moved my office at home, probably
3  80 to 90 percent of the time.
4  Q   When you moved your office to home, how
5  did that change?
6  A   I was probably in the dealerships less
7  than 20 percent of my working week.
8  Q   Did that continue on after 1997?
9  A   Yes. It continued on until early 2001 or
10 late 2000.
11 Q   About 20 percent of your time was spent in
12 the dealerships, the rest was in your home office?
13 A   Yes.
14 Q   Literally your home office?
15 A   Literally.
16 Q   Who was her supervisor, Ms. Dunn?
17 A   She had joint supervisors. It was me and
18 Jim Capron.
19 Q   Mr. Capron, as you indicated, was an
20 officer of NuCar Connection, Inc.?
21 A   Was not at the time.

Page 24

1  Q   He became?
2  A   He became.
3  Q   Now, you refer to her as Arlene.
4  A   I do.
5  Q   Barbara A. Dunn I take it means Barbara
6  Arlene Dunn?
7  A   That is what I understand.
8  Q   Is that how she was known, as Arlene?
9  A   Yes, sir.
10 Q   So in the Summer of 2000 when this
11 incident occurred, what was your understanding as
12 to who Ms. Dunn was employed by?
13 A   She was employed by NuCar Connection, Inc.
14 Q   And as office manager?
15 A   Correct. May I retract that?
16     MR. BEKMAN:  Sure.
17 A   There had been two office managers in that
18 store. Arlene was promoted to the title of site
19 controller. Office management duties as far as
20 the day-to-day supervision of individual employees
21 fell to another woman. Her name is Deborah

Page 25

1  Powell. Arlene was working more with Mr. Capron
2  on analysis and auditing.
3  Q  So she had a new title?
4  A  She did.
5  Q  Were you still her supervisor?
6  A  That's correct.
7  Q  When she assumed her new title, were you
8  her direct supervisor?
9  A  Mr. Capron and I shared direction.
10 Q  I want to ask you some questions about the
11 vehicle that Ms. Dunn was operating. According to
12 the information that we have, in 2000, in July of
13 2000 when this incident occurred, Ms. Dunn was
14 operating a Chevrolet Camaro, a 2000 Chevrolet
15 Camaro that was owned by NuCar Connection.
16 A  Correct.
17 Q  Is that your understanding?
18 A  Yes, it is.
19 Q  Would that be NuCar Connection, Inc. --
20 A  Correct.
21 Q  -- as the owner?

Page 26

1  A  Yes.
2  Q  Tell me if you can, as best you can
3  recall, the circumstances under which someone such
4  as Ms. Dunn would be, in essence, given an
5  automobile to operate.
6  A  We don't exactly call it given.
7  Q  Okay. Permitted to use. How is that?
8  A  That would be fine. We are in the
9  business of selling cars. It is in our best
10 interests to have vehicles available for test
11 drives. We also think that some of our top-level
12 people are excellent representations of our
13 company.
14    There are certain people who are given
15 permission to use a demonstrator under certain
16 stipulations and rules as part of their employment
17 package.
18 Q  The purpose of permitting these more
19 high-level people, if you will, the ability to use
20 these vehicles was to help promote the dealership?
21 A  It also promotes the product.

Page 27

1  Q  Would, for example, the tag on the vehicle
2  say NuCar Connection?
3  A  The license plate frame would probably say
4  NuCar Connection. There would definitely be a
5  Mylar identification on the back trunk deck lid or
6  pickup tailgate. There would also probably be a
7  front license plate that would identify the vehicle
8  as a NuCar vehicle.
9  Q  So anyone who would be looking at that
10 vehicle would know this is a NuCar, NuCar, N-u, car
11 vehicle they would see on the highway?
12    MR. BISER:  Objection as to what
13 some other person would know.
14    MR. BEKMAN:  Let me rephrase the
15 question. It was poorly phrased.
16 Q  (By Mr. Bekman) If an individual were to
17 look at the license plate, front or back, or the
18 logo that tells you where the vehicle may have come
19 from, they would see NuCar Connection?
20 A  Yes, sir, they would.
21 Q  As far as NuCar Connection was concerned,

Page 28

1  they wanted to promote that fact to the public?
2  A  Yes, sir.
3  Q  What top-level employees were given that
4  privilege, if you will?
5  A  Sales managers, business managers, myself,
6  Mr. Capron, Arlene, three service managers, three
7  parts managers, and a body shop manager, I believe,
8  and the owners.
9  Q  Sure. In this particular case, it is the
10 year 2000 when this incident occurred and she was
11 driving a 2000 Camaro. Was there a practice or
12 procedure whereby certain types of vehicles were
13 given out? In other words, this was a rather new
14 vehicle.
15 A  Demonstrators, by definition, are new
16 vehicles in our business. They are not titled.
17 They are on Certificates of Origin. The fleet is
18 mixed, the fleet being the fleet of demonstrators
19 is mixed so that a vehicle would be available for a
20 customer to drive so that our people are familiar
21 with the attributes of a range of product.

Page 29

1    In other words, Ms. Dunn wouldn't have
2  always been driving a Camaro. She might have been
3  driving a Mazda 626 prior to that, or a Chevrolet
4  pickup truck.
5    Q  Was the frequency of the use changed every
6  5,000 miles, every 10,000 miles? How was that
7  done?
8    A  You keep a demonstrator no more than 5,000
9  miles and no more than six months, whichever occurs
10 first. But it could be a much faster turn than
11 that, because every vehicle that is a demonstrator
12 is available for immediate sale.
13   Q  So that, for example, if Ms. Dunn were out
14 with her Camaro, her 2000 Camaro, and it says it is
15 a NuCar and somebody sees the car and they like the
16 car and they come to the dealership and say I saw
17 this car out on the roadway, and do you have this
18 car, and that car happens to be available, that
19 demo could be sold to someone in the general
20 public?
21   A  Not prior to coming back on to the lot,

Page 30

1  but yes.
2    Q  Has that happened? Does that happen?
3    A  Yes, sir.
4    Q  Was that another reason why NuCar wanted
5  this to be available to the public to see?
6    A  They are rolling billboards.
7    Q  So they are advertisements and they are on
8  the road, and if they are on the road and people
9  see them, that is a benefit to NuCar?
10   A  That would be our hope. The other
11 benefit to NuCar is that our employees are more
12 familiar with the product line that we are
13 representing.
14   Q  How about somebody in her capacity where
15 she is, in essence, an assistant controller, does
16 that help her, too, as far as understanding the
17 product?
18   A  I can't speak for Arlene. I always felt
19 that it helped me understand the product.
20   Q  How did that help you as controller?
21   A  Everyone knows a certain number of people.

Page 31

1  One would hope that you would not be afraid of
2  saying where you worked.
3    Q  I got the picture. You are working for
4  NuCar. You are driving this nice new car.
5  Somebody looks at your car and says gee, that is a
6  nice car, what can you tell me about it, and they
7  could tell you about it?
8    A  To a degree. I would certainly not field
9  a question like that. I would say I work for
10 NuCar and these are wonderful cars. May I hook you
11 up with a salesman so you can drive one?
12   Q  You are kind of like a mini-salesperson
13 for NuCar hopefully?
14   A  Whether or not I am in a vehicle or on a
15 skateboard, I would hope that would be true.
16   Q  Were employees encouraged to do that?
17   A  All employees are encouraged to do that.
18   Q  It helps the business?
19   A  All employees should be comfortable enough
20 with what they are doing, I don't care whether it
21 is a car dealership or grocery store, to say I work

Page 32

1  at thus and so a place.
2    Q  Particularly if you have a good product to
3  sell?
4    A  Yes.
5    Q  Okay. You mentioned earlier that --
6  before I get into that, was there ever any
7  consideration given to the employees who fit in
8  this category who had these demo vehicles of NuCar,
9  that by having a NuCar, N-u Car in their
10 possession, that if they were ever asked, for
11 example, to come into work, maybe even at an odd
12 time, that they would have no hesitation doing so,
13 because the car is there and available and it is a
14 benefit to the employer to have the employee be
15 available to come in to work?
16   A  No. There was never any thought process
17 like that.
18   Q  The vehicles themselves, let's take the
19 vehicle that Ms. Dunn was operating, would that be
20 insured by NuCar?
21   A  Yes, sir.

Page 37

1  A  Yes. The weekly payroll, however, would
2  show it going in and coming out.
3     MR. BISER: I just want to make sure
4  it is clear. When we are showing it, we are
5  showing it from the employee's side versus the
6  dealership's side.
7  Q  (By Mr. Bekman) You don't happen to have
8  with you a typical statement that would show that,
9  do you?
10 A  No, sir.
11 Q  Do you have that in your possession, a
12 specimen type that I could see or look at that
13 would show that?
14 A  Yes, sir.
15    MR. BISER: You say her possession.
16 She doesn't have one here.
17    MR. BEKMAN: I know.
18 Q  (By Mr. Bekman) Under your control?
19 A  Yes, sir.
20    MR. BEKMAN: I would ask you to do
21 that, send it to Mr. Biser, and Mr. Biser and I

Page 38

1  will work out the details. Locate it. I will
2  talk to Mr. Biser about it.
3     MR. BISER: Did you keep any from
4  Ms. Dunn's?
5  A  No. I don't believe so. I might have,
6  but I will be able to retrieve one from the
7  document management system.
8     MR. BISER: We will talk about that.
9  Q  (By Mr. Bekman) You said earlier in your
10 testimony that the demos that were given to certain
11 people were given to them under certain
12 stipulations or certain conditions.
13 A  Correct.
14 Q  Were those stipulations or conditions
15 reduced to writing?
16 A  Yes, sir.
17 Q  Where would they be contained?
18 A  In a demonstrator agreement.
19 Q  Do you have a specimen copy of that with
20 you?
21 A  I do.

Page 39

1  Q  May I see it?
2     MR. BISER: It is not a specimen
3  copy. It was the actual agreement.
4     MR. BEKMAN: Very good. I don't
5  want to mark it if it is an original.
6     MR. BISER: We can mark it and then
7  make copies of it.
8        (Document marked Chickersky
9         Deposition Exhibit 2.)
10 Q  (By Mr. Bekman) I have marked this as
11 Exhibit Number 2. There is a note on here that
12 charges for the use of the demonstrator of $200 a
13 month. You mentioned before about $2,000. This
14 would be about $2400.
15 A  Yes.
16 Q  Now, this is a Demonstrator Plan dated
17 November 1st, 1991. Was that the only
18 Demonstrator Plan that existed?
19 A  There had not been changes prior to this
20 incident.
21 Q  To your knowledge, does this represent the

Page 40

1  full, quote, unquote, stipulations and rules
2  relating to the use of the demo?
3  A  Yes, sir.
4  Q  NuCar was, I'm using that term
5  generically, NuCar Connection or NuCar, Inc. was
6  aware of the fact that people who were using the
7  demo were going to be using them not only to drive
8  to and from work, but were going to be using them
9  for their personal use?
10 A  Within the confines of those rules, that
11 is correct.
12 Q  As you have indicated earlier, at least to
13 a certain extent, NuCar would encourage the user,
14 if you will, to show that vehicle off in the
15 community?
16 A  By virtue of the fact that it is on the
17 road, it is being shown off, yes.
18 Q  In essence, it is being shown, here is our
19 NuCar vehicle and it is a great car?
20 A  One would hope.
21 Q  You would hope that people would see it

10 (Pages 37 to 40)